CLERK
U.S. DISTRICT COURT
UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY
**DISTRICT OF NEW JERSEY**

2025 APR -3 P 4: 00

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* [UNDER SEAL], Plaintiff, v. [UNDER SEAL], Defendant. | Civil Action No. _____ <br><br> Hon. _____ <br><br> **QUI TAM COMPLAINT** <br><br> **FILED IN CAMERA AND UNDER SEAL UNDER 31 U.S.C. § 3730(b)(2)** <br><br> **JURY TRIAL DEMANDED** <br><br> **DO NOT PLACE ON PACER** <br> **DO NOT PLACE IN PRESS BOX** |

SHN\902027.1

CLERK
U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

2025 APR -3 P 4: 00

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* AIDAN FORSYTH, <br><br>Plaintiff-Relator, <br><br>v. <br><br>FRED BEANS HOLDINGS, INC., FRED BEANS PARTS, INC., AUTO EXPRESS ENTERPRISES, INC., AUTORENT OF DOYLESTOWN, INC., and MCCAFFERTY AUTORENT, INC., <br><br>Defendants. | Civil Action No. _____ <br><br>Hon. _____ <br><br>**QUI TAM COMPLAINT** <br><br>**FILED IN CAMERA AND UNDER SEAL UNDER 31 U.S.C. § 3730(b)(2)** <br><br>**JURY TRIAL DEMANDED** |

On behalf of the United States of America (the "United States" or the "Government"), Plaintiff and Relator Aidan Forsyth ("Relator") files this *qui tam* action against defendants Fred Beans Holdings, Inc. ("FBH"), Fred Beans Parts, Inc. ("FBP"), Auto Express Enterprises, Inc. ("AEE"), Autorent of Doylestown, Inc. ("ADI") and McCafferty Autorent, Inc. ("MAI") (together, the "Fred Beans Entities" or "Defendants"), and alleges as follows:

## INTRODUCTION

1.      This is an action to recover treble damages, civil penalties, and all other remedies on behalf of the United States of America in connection with Defendants' materially false and fraudulent applications to the Government for loans under the Small Business Administration's ("SBA") Paycheck Protection Program ("PPP") in violation of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA").

2.      Pursuant to the FCA, Relator seeks to recover, on behalf of the United States of America, damages and civil penalties arising from false or fraudulent claims for payment that

1

Defendants submitted or caused to be submitted to the Federal Government-funded and/or subsidized PPP loan program.

## SUMMARY OF ALLEGATIONS

3. The Paycheck Protection Program (PPP) was established to provide small businesses with the resources necessary to maintain their payroll and cover related overhead during the COVID-19 crisis. The SBA provided guidance for the implementation of the PPP, including size eligibility requirements.

4. A business concern was "small" for the purpose of qualifying for a PPP loan depending on its size when compared to a size standard, which was typically stated in terms of either receipts or employees. The business's designated representative was required to certify that the business had no more than 500 employees or, if it did have more than 500 employees, that it qualified for an affiliation waiver or had a tangible net worth and historic net income that would satisfy the SBA's alternative size standard.

5. The SBA specified that, for purposes of this headcount limit, companies were required to report all employees of their affiliates.

6. At all times relevant to this action, the Fred Beans Automotive Group owned and operated approximately 25 auto dealerships, with over 1,700 employees and over $1 billion in annual revenue.

7. FBH was the parent company of the corporate entities comprising the Fred Beans Automotive Group. Upon information and belief, FBH was personally owned by Fred Beans, who originally founded the business as a service station in 1959, and members of his family.

8. In the aggregate, the Fred Beans Automotive Group far exceeded the size and revenue limitations of businesses eligible to participate in SBA programs, including the PPP loan

2

SHN\902027.1

program. Although most of the corporate entities comprising the Fred Beans Automotive Group were eligible due to the SBA's franchise exception (18 of them receiving a total of approximately $16 million in PPP loans), none of the Fred Beans Entities qualified under that or any other SBA exception. Accordingly, none of the Defendants were eligible to receive a first-draw PPP loan or forgiveness thereof.

9.      Nonetheless, in or about April 2020, the Fred Beans Entities applied for and received a total of approximately $4 million in first-draw PPP loans, which were forgiven in their entirety in August and September 2021.

10.     All of the Fred Beans Automotive Group borrowers received their loans from a single lender located in Ohio.

11.     Upon information and belief, one or more of Fred Beans Entities' representatives prepared or caused to be prepared the loan applications as their designated authorized representative or representatives.

12.     The first-draw loan application required each borrower's designated representative to certify that the entity was an eligible business under SBA rules, to disclose and list any affiliates, to disclose its total number of employees (including those of such affiliates), and to attest that the applicant and its affiliates employed no more than 500 people.

13.     If the applicant (combined with its parent(s) and affiliates) had more than 500 employees, its representative had to provide and attest to information showing that it qualified for an affiliation waiver and/or met the SBA's alternative size standard.

14.     In the Fred Beans Entities' case, to qualify for an affiliation waiver, each applicant would have to attest that its North American Industry Classification System (NAICS) code began with the digits 72, that it operated as a franchise that the SBA had assigned a

3

franchise identifier code, or that it had received financial help from a company licensed under section 301 of the Small Business Investment Act of 1958.

15.     Alternatively, each applicant (including headcount/receipts of its parent(s) and affiliates) would have to meet the employee-based size standard for its NAICS code or to have had average annual receipts for the preceding three fiscal years less than the maximum assigned for that NAICS code.

16.     Another way for a borrower to qualify was if it (combined with its parent(s) and affiliates) had a maximum tangible net worth of not more than $15 million, *and* had an average net income after taxes for the preceding two fiscal years of not more than $5 million.

17.     The application also required the representative to acknowledge that the information submitted was material to the Government, to certify that it was true and correct, and to acknowledge that submitting a materially false application would violate federal law.

18.     However, in the Defendants' applications, the representative or representatives falsely and fraudulently certified that they were eligible businesses under SBA rules, failed to disclose and list some or all of their affiliates, and/or understated the total number of employees. In the alternative, each representative falsely and fraudulently understated the Fred Beans Automotive Group's employee headcount and/or historical financial information to meet the alternative size standard. The representatives also expressly acknowledged that these were material questions and that submitting a materially false application would violate federal law.

19.     On or about April 9 and 13, 2020, Defendants were issued first-draw PPP loans totaling approximately $4 million. Upon information and belief, these loans were extended in reliance on material false statements and certifications concerning the borrowers' eligibility.

4

20.     On or about April 9, 2020, in reliance on material false statements and certifications concerning the borrowers' eligibility in its first-draw loan application, a lender extended an approximately $3 million PPP loan to FBP.

21.     On or about April 9, 2020, in reliance on material false statements and certifications concerning the borrowers' eligibility in its first-draw loan application, a lender extended an approximately $60,000.00 PPP loan to ADI.

22.     On or about April 13, 2020, in reliance on material false statements and certifications concerning the borrowers' eligibility in its first-draw loan application, a lender extended an approximately $745,000.000 PPP loan to FBH.

23.     On or about April 13, 2020, in reliance on material false statements and certifications concerning the borrowers' eligibility in its first-draw loan application, a lender extended an approximately $39,000.00 PPP loan to MAI.

24.     In or about August and September 2021, by submitting additional materially false and fraudulent applications, the Fred Beans Entities obtained forgiveness of their PPP loans, along with fees and accrued interest.

25.     Tellingly, although the lender forgave (and the Government repaid) the Fred Beans Automotive Group borrowers' approximately $20 million in first-draw PPP loans, none of these entities received a second-draw PPP loan.

26.     Relator files this *qui tam* lawsuit to enable the Government to recover from Defendants the SBA-guaranteed monies that were provided to Defendants as the result of their wrongdoing, and interest, bank fees and costs paid by the Government. Relator further seeks to recover treble damages and/or penalties as provided by the FCA, as well as his attorneys' fees, costs and expenses.

5

## JURISDICTION, VENUE, AND SPECIAL REQUIREMENTS

27. This Court possesses subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States, under 31 U.S.C. § 3729 of the False Claims Act, and under 28 U.S.C. § 1345, which provides the United States District Courts with original jurisdiction over all civil actions commenced by the United States of America.

28. In addition, the FCA specifically confers jurisdiction upon the United States District Courts under 31 U.S.C. § 3732. This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because the Defendants owned property, maintained places of business, did business, and/or submitted their PPP Loan application and/or request for loan forgiveness to a lender in or from this District.

29. Venue is proper in this District under 31 U.S.C. § 3732(a) because the wrongdoing alleged herein took place within this and/or affected this District.

30. In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed *in camera* and will remain under seal for a period of at least sixty (60) days and shall not be served on the Defendants until the Court so orders.

31. Pursuant to 31 U.S.C. § 3730(b)(2), the Relator must provide the Government with a copy of the Complaint and a written disclosure of substantially all material evidence and material information in his possession contemporaneous with the filing of the Complaint. Relator has complied with this provision by serving copies of the Complaint and such disclosure upon Alina Habba, Acting United States Attorney for the District of New Jersey, and upon the Honorable Pamela J. Bondi, Attorney General of the United States.

32. Relator is not aware that the allegations in this Complaint have been publicly disclosed. In any event, this Court has jurisdiction under 31 U.S.C. § 3730(e)(4) because the

6

SHN\902027.1

Relator is an "original source" since he has voluntarily provided his information to the Government before filing this Complaint, and has knowledge, which is both direct and independent of, and materially adds to, any public disclosures to the extent they may exist.

## PARTIES/AFFILIATES

33.    At all times relevant to this action, Plaintiff/Relator Aidan Forsyth resided at 55 West 8th Street, New York, NY 10011.

34.    At all times relevant to this action, Defendant Fred Beans Holdings, Inc. ("FBH") was a corporation that was incorporated in the Commonwealth of Pennsylvania on or about April 16, 1999. Its principal place of business and registered office was located at 3960 Airport Blvd, Doylestown, PA 18902.

35.    Defendant Fred Beans Parts, Inc. ("FBP") was a corporation that was incorporated in the Commonwealth of Pennsylvania on or about September 6, 2000. Its principal place of business and registered office was located at 131 Doyle Street, Doylestown, PA 18901.

36.    On or about March 3, 2005, FBP registered to do business in the State of New Jersey. It maintained places of business at 25 County Road 628, Sussex, NJ 07461 and 510 Heron Drive, #303, Swedesboro, NJ 08085.

37.    Defendant Auto Express Enterprises, Inc. ("AEE") (formerly doing business as Bucks County Towing Inc.) was a corporation that was incorporated in the Commonwealth of Pennsylvania on or about July 17, 2017. Its principal place of business and registered office was located at 3960 Airport Blvd, Doylestown, PA 18902.

38.    Defendant Autorent of Doylestown, Inc. ("ADI") was a corporation that was incorporated in the Commonwealth of Pennsylvania on or about February 27, 1991. Its principal

7

SHN\902027.1

place of business and registered office was located at 835 North Easton Rd, Doylestown, PA 18902.

39.     Defendant McCafferty Autorent, Inc. ("MAI") was a corporation that was incorporated in the Commonwealth of Pennsylvania on or about September 27, 2002. Its principal place of business and registered office was located at 1939 Lincoln Highway, Langhorne, PA 19047.

40.     Non-defendant Doylestown Imports Inc. ("DI") was a corporation that was incorporated in the State of Pennsylvania on or about February 11, 2016. Its registered office was located at 3960 Airport Blvd, Doylestown, PA 18902. DI operated as a franchised Volkswagen Dealership. Its principal place of business was located at 830 North Easton Rd, Doylestown, PA 18902.

41.     Non-defendant Fred Beans Automotive of Flemington Inc. ("FBAF") was a corporation that was incorporated in the State of New Jersey on or about June 5, 2018. FBAF operated as a franchised Hyundai dealership, doing business as Fred Beans Hyundai of Flemington. Its principal place of business was located at 180 US-202 Building B, Flemington, NJ 08822.

42.     Non-defendant Fred Beans Cadillac Oldsmobile Inc. ("FBCO") was a corporation that was incorporated in the Commonwealth of Pennsylvania on or about May 20, 1988. FBCO operated as a franchised General Motors dealership, doing business at 841 North Easton Rd, Doylestown, PA 18902.

43.     Non-defendant Fred Beans Chevrolet Inc. ("FBC") was a corporation that was incorporated in the Commonwealth of Pennsylvania on or about September 10, 1973. FBC

8

SHN\902027.1

operated as a franchised General Motors dealership. Its principal place of business and registered address was located at 845 North Easton Rd, Doylestown, PA 18902.

44.    Non-defendant Fred Beans Ford Inc. ("FBF") was a corporation that was incorporated in the Commonwealth of Pennsylvania on or about December 23, 1970, as J. J. Conroy, Inc. FBF operated as a franchised Ford dealership. Its principal place of business and registered office was located at 876 North Easton Rd, Doylestown, PA 18902.

45.    Non-defendant Fred Beans Ford of Boyertown, Inc ("FBFB") was a corporation that was incorporated in the Commonwealth of Pennsylvania on or about December 24, 1957. FBFB operated as a franchised Ford dealership. Its principal place of business and registered office was located at 525 PA-100, Bechtelsville, PA 19505.

46.    Non-defendant Fred Beans Ford of West Chester Inc ("FBFWC") was a corporation that was incorporated in the Commonwealth of Pennsylvania on or about July 10, 1990. FBFWC operated as a franchised Ford dealership. Its principal place of business and registered office was located at 1155 West Chester Pike, West Chester, PA 19382.

47.    Non-defendant Fred Beans Imports of Doylestown Inc. ("FBID") was a corporation that was incorporated in the Commonwealth of Pennsylvania on or about January 26, 2006. FBID operated as a franchised Nissan dealership. Its principal place of business and registered office was located at 4469 West Swamp Road, Doylestown, PA 18902.

48.    Non-defendant Fred Beans Imports of Flemington, Inc. ("FBIF") was a corporation that was incorporated in the Commonwealth of Pennsylvania on or about June 12, 2012. FBIF operated as a franchised Nissan dealership. Its listed headquarters address was located at 3960 Airport Blvd, Doylestown, PA 18902; however, its principal place of business was located at 172 US-202, Flemington, NJ 08822.

9

49. Non-defendant Fred Beans Motors of Doylestown, Inc. ("FBMD") was a corporation that was incorporated in the Commonwealth of Pennsylvania on or about October 21, 1976. FBMD operated as a franchised Nissan dealership. Its registered office was located at 858 N Easton Rd, Doylestown, PA 18902; however, its principal place of business was located at 4469 West Swamp Road, Doylestown, PA 18902.

50. Non-defendant Fred Beans Motors of Flemington, Inc. ("FBMF") was a corporation that was incorporated in the Commonwealth of Pennsylvania on or about June 12, 2012. FBMF operated as a franchised Toyota dealership. Its registered office was located at 3960 Airport Blvd, Doylestown, PA 18902; however, its principal place of business was located at 174 US-202, Flemington, NJ 08822.

51. Non-defendant McCafferty Ford of Mechanicsburg, Inc ("MFM") was a corporation that was incorporated in the Commonwealth of Pennsylvania on or about September 13, 2000. MFS operated as a franchised Ford dealership. Its principal place of business and registered office was located at 6320 Carlisle Pike Mechanicsburg, PA 17050.

52. Non-defendant McCafferty Ford Sales Inc ("MFS") was a corporation that was incorporated in the Commonwealth of Pennsylvania on or about September 1, 1981. MFS operated as a franchised Ford dealership. Its principal place of business and registered office was located at 1939 Lincoln Hwy, Langhorne, PA 19047.

53. Non-defendant McCafferty Hyundai Sales Inc ("MHS") was a corporation that was incorporated in the Commonwealth of Pennsylvania on or about October 22, 1985. MHS operated as a franchised Hyundai dealership. Its principal place of business and registered office was located at 1106 Lincoln Hwy, Langhorne, PA 19047.

10

54.    Non-defendant McCafferty Motors of Mechanicsburg, Inc. ("MMM") was a corporation that was incorporated in the Commonwealth of Pennsylvania on or about September 13, 2000.  MMM operated as a franchised Kia dealership. Its principal place of business and registered office was located at 6302 Carlisle Pike, Mechanicsburg, PA 17050.

55.    Non-defendant Newtown Auto Sales, Inc. ("NAS") was a corporation that was incorporated in the Commonwealth of Pennsylvania on or about February 11, 2016. NAS operated as a franchised Ford dealership. Its registered office was located at 3960 Airport Blvd, Doylestown, PA 18902; however, its principal place of business was located at 10 North Sycamore Street, Newtown, PA 18940.

56.    Non-defendant Saturn of Devon Inc. ("SD") was a corporation that was incorporated in the Commonwealth of Pennsylvania on or about January 31, 1997. SD operated as a franchised Volkswagen dealership. Its principal place of business and registered office was located at 315 W Lancaster Ave, Devon, PA 19333.

**GOVERNING LAWS, REGULATIONS, AND CODES OF CONDUCT**

**The False Claims Act**

57.    Originally enacted in 1863, the FCA was substantially amended in 1986 by the False Claims Amendments Act.  The 1986 amendments enhanced the Government's ability to recover losses sustained as a result of fraud against the United States.  Further clarifying amendments were adopted in May 2009 and March 2010.

58.    The FCA imposes liability upon any person who "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval"; or "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim"; or "knowingly makes, uses, or causes to be made or used, a false record

11

or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(A), (B), (G). Any person found to have violated these provisions or conspired to have violated these provisions is liable for a civil penalty of at least \$14,308.00 and up to \$28,619.00 for each such false or fraudulent claim, plus three times the amount of the damages sustained by the Government. 31 U.S.C. § 3729(a)(1)(G), 20 CFR Part 356 and 28 CFR Part 85 (*see* 89 FR 106310, Dec. 30, 2024).

59.    The FCA defines the terms "knowing" and "knowingly" to mean that a person (1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or acts "in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). The statute provides that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b)(1)(B).

60.    The FCA also broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

61.    The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to

12

share in any recovery. The complaint must be filed under seal without service on any Defendant. The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to intervene in the action. 31 U.S.C. § 3730(b).

62.    In this action, and under well-established precedent, the false and fraudulent nature of Defendants' conduct is informed or measured by their violation of, or failure to comply with, certain statutes and regulations material to the submission of applications for government-subsidized and/or issued small business loans.

### The CARES Act Authorizes Paycheck Protection Program Loans

63.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act (Pub. L. 116-136) (the "CARES Act" or the "Act") was enacted in March 2020 to provide emergency financial assistance to individuals and businesses affected by the COVID-19 pandemic. The Act provided the federal Small Business Administration ("SBA") with funding and authority to modify existing loan programs and establish a new loan program to assist small businesses adversely affected by the pandemic.

64.    Section 1102 of the CARES Act authorized the SBA to guarantee up to $349 billion in forgivable 7(a) loans to small businesses for job retention and other expenses. This program was called the Paycheck Protection Program ("PPP"). In April 2020, Congress authorized over $300 billion to additionally fund the PPP. In June 2020, the Paycheck Protection Program Flexibility Act of 2020 (Pub. L. 116-142) was enacted which changed certain provisions of the PPP, including provisions relating to the maturity of loans, the deferral of loan payments, and loan forgiveness.

65.    Under the PPP, eligible businesses could obtain *one* SBA-guaranteed first-draw PPP loan. Businesses were required to spend loan proceeds for employee compensation, rent or

13

mortgage, and other specified expenses and, depending on their use of the loan proceeds, could qualify for loan forgiveness, up to the full amount of the loan.

66.    The SBA used size standards to determine if a business was a "small business concern" and therefore eligible to apply for an SBA-guaranteed PPP loan. To be deemed eligible, a business had to have fewer than 500 employees or meet the SBA industry size standard, if more than 500. The Small Business Jobs Act of 2010, Section 1116 established an alternative size standard of not more than $15 million in tangible net worth and of not more than $5 million in the average net income after federal income taxes (excluding any carry-over losses) of the applicant for the two full fiscal years before the date of the application.

67.    The SBA also considered whether a business had "affiliates" subject to mutual equity/stock ownership, overlapping management and/or control. *See id.* Subpart A, § 121.103. Businesses which are "affiliates" of each other under the SBA's definitions "may be treated as one party with such interests aggregated," including aggregating the businesses' annual receipts and number of employees. *See id.* §§ 121.103, 121.104 & 121.106. For purposes of the size standard, the size of the applicant combined with its affiliates must not exceed the size standard designated for either the primary industry of the applicant alone or the primary industry of the applicant and its affiliates, whichever is higher. 13 C.F.R. §121.301.

68.    First-draw borrowers with more than 500 employees could still qualify for the PPP under the following affiliation waivers:

a.   Any business concern with less than 500 employees that, as of the date on which the loan is funded, was assigned a North American Industry Classification System (NAICS) code beginning with the digits 72 (essentially restaurants, hotels, etc.);

14

SHN\902027.1

b. Any business concern operating as a franchise that was assigned a franchise identifier code by the SBA; or

c. Any business concern that had received financial help from a company licensed under section 301 of the Small Business Investment Act of 1958 (15 U.S.C. 681).

69. A first-draw borrower could also qualify under SBA size exceptions if:

a. It was in an industry the SBA identified by designated NAICS codes as eligible under an employee-based size standard;

b. It (along with affiliates) had average annual receipts over the three completed fiscal years preceding the PPP application less than the amount designated by the SBA for that industry (again, identified by designated NAICS codes); or

c. It (along with affiliates) qualified under the "alternative size standard," meaning as of March 27, 2020, it (1) had a maximum tangible net worth of not more than $15 million, *and* (2) had an average net income after Federal income taxes (excluding any carry-over losses) of not more than $5 million for the last two fiscal years before the date of the application.

70. The SBA delegated authority to third-party lenders to underwrite and approve the PPP loans. To obtain a PPP loan, a qualifying business (through its authorized representative) signed and submitted a PPP loan application (SBA Form 2483) online through the lender's application platform. The PPP loan application required the business (through its authorized representative) to acknowledge the PPP program rules and make certain affirmative certifications to be eligible to obtain the PPP loan.

71. Specifically with regard to these eligibility criteria, the loan application asked, "Is the Applicant or any owner [1] of the Applicant an owner of any other business, or have common

---

[1] Defined by the SBA as an individual with a 20% or greater equity interest in the business.

15

management with, any other business?" If the answer was yes, the applicant was required to "list all such businesses and describe the relationship on a separate sheet[.]"

72. In December 2020, the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (the Economic Aid Act) was enacted, authorizing the SBA to guarantee "Paycheck Protection Program Second Draw Loans . . . under generally the same terms and conditions available under the Paycheck Protection Program[.]" See 86 Fed. Reg. 3712-3723 (Jan. 14, 2021).

73. The original PPP loan application (SBA Form 2483), which was effective April 2, 2020 through June 12, 2020, required the borrower's authorized representative to state the total number of employees, and to indicate if "the Applicant or any owner of the Applicant an owner of any other business, or have common management with, any other business" and if so, to "list all such businesses and describe the relationship on a separate sheet[.]"

74. The borrower's authorized representative was required to certify, among other things, that:

- The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) and the Department of the Treasury (Treasury) implementing Second Draw Paycheck Protection Program Loans under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) and the Economic Aid to Hard-Hit Small Businesses, Nonprofits and Venues Act (the Paycheck Protection Program Rules).The Applicant (1) is an independent contractor, eligible self-employed individual, or sole proprietor or (2) employs no more than the greater of 500 or employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry.

\* \* \*

16

- All loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rules.

75. Besides the total number of employees, the borrower's authorized representative was also required to certify, among other things, the business's average monthly payroll expenses. This information was used to calculate the amount of money the business was eligible to be loaned. The applicant was also required to submit documentation showing payroll expenses, among other things.

76. The applicant's authorized representative was finally required to acknowledge and certify in good faith by initialing the following certification:

[T] he information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

77. PPP loan applications were processed by participating financial institutions, which served as the lenders. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, were transmitted by the lender to the SBA in the course of processing the loan. SBA paid processing fees to lenders.

78. Once a borrower submitted its PPP loan application to a lender, the participating lender processed the PPP loan application. If a PPP loan application was approved by the participating lender, the lender submitted the application to SBA for an SBA loan number and after receiving that number it thereafter funded the PPP loan using its own monies, which were 100% guaranteed by the SBA.

17

79.     A borrower was required to use PPP loan proceeds only for certain permissible expenses: payroll costs, interest on mortgages, rent and utilities.  The SBA made clear that "[u]nder no circumstances may PPP funds be used to support non-U.S. workers or operations." 85 Fed. Reg. at 30837.

80.     The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expenses within a designated period (between eight (8) and twenty-four (24) weeks from receiving the proceeds) and uses at least 60% of the proceeds for payroll expenses.

## SPECIFIC FRAUD ALLEGATIONS

### The Fred Beans Automotive Group in the Aggregate Was Too Large in Headcount and Financial Size for the Fred Beans Entities to be Eligible for First-Draw PPP Loans

81.     At all times relevant to this action, Defendants shared common ownership and management, and thus were affiliates of one another and part of the same corporate group (the Fred Beans Automotive Group) under SBA rules.

82.     In the aggregate, the Fred Beans Entities, along with their affiliates employed far too large a headcount and were too large in their current tangible net worth and average historical net income to be eligible to receive first-draw PPP loans.

83.     The Fred Beans Automotive Group publicly reported having over 2,000 employees at the end of 2019.

84.     The Fred Beans Automotive Group publicly reported 1,497 active participants in its U.S. retirement plan at the beginning of calendar year 2019 and 1,617 active participants at year end 2019.

18

SHN\902027.1

85.    The Fred Beans Automotive Group publicly reported 1,617 active participants in its U.S. retirement plan at the beginning of calendar year 2020 and 1,498 active participants at year end 2020.

86.    The Fred Beans Automotive Group publicly reported 1,498 active participants in its U.S. retirement plan at the beginning of calendar year 2021 and 1,338 active participants at year end 2021.

87.    With Fred Beans Automotive Group's aggregate headcount far exceeding 500, the Fred Beans Entities could not qualify for first-draw PPP loans under any of the potentially applicable SBA affiliation waivers.

88.    FBH's NAICS Code was 441110 ("New Car Dealers"); FBP's NAICS Code was 423120 ("Motor Vehicle Supplies and New Parts Merchant Wholesalers"); AEE's NAICS Code was 811111 ("General Automotive Repair"); and MAI's NAICS Code was 532111 ("Passenger Car Rental").

89.    None of these codes began with 72.

90.    None of the Fred Beans Entities operated as a franchise that was assigned a franchise identifier code by the SBA. Nor upon information and belief had any received financial help from a company licensed under section 301 of the Small Business Investment Act of 1958 (15 U.S.C. § 681).

91.    Nor did any of the Fred Beans Entities qualify for first-draw PPP loans under the SBA's employee-based size standard. FBH's NAICS Code 441110 had an employee-based size standard of 200 employees. FBP's NAICS Code 423120 had an employee-based size standard of 200 employees. Neither AEE's NAICS Code 811111 nor MAI's NAICS Code 532111 had an employee-based size standard.

19

92.     Neither FBH's nor FBP's NAICS Code had a receipt-based size standard.  AEE's NAICS Code 811111 had a receipt-based size standard of $8 million; MAI's NAICS Code 532111 had a receipt-based size standard of $41.5 million.  As alleged, the Fred Beans Automotive Group reported over $1 billion in annual sales in 2019, far exceeding these limits.

93.     Likewise, none of the Fred Beans Entities were eligible under the SBA's alternative size standard.

94.     Upon information and belief,[2] as of the dates of Defendants' PPP loan applications in April 2020, the Fred Beans Automotive Group far exceeded the SBA's $15 million maximum tangible net worth and had an average net income after Federal income taxes (excluding any carry-over losses) exceeding $5 million for the previous two fiscal years.

## Despite being Ineligible under SBA Regulations, Fred Beans Holdings, Inc. Applied for and Received a First-Draw PPP Loan, which was Later Entirely Forgiven

95.     In or about April 2020, FBH applied for a first-draw PPP loan in the amount of approximately $745,000.00.

96.     Upon information and belief, an authorized representative of FBH prepared SBA Form 2483, in which the representative falsely and fraudulently certified that FBH qualified as a small business concern eligible for participation in the PPP Loan Program, by failing to disclose its corporate group's total number of employees, and failing to acknowledge that FBH had numerous affiliates, by omitting information concerning those companies' common ownership.

97.     The representative indicated 45 as the "Number of Employees" for FBH.

---

[2] As privately-held companies, Relator cannot ascertain the Fred Beans Automotive Group's tangible net worth or equity capital at the time Defendants applied for their PPP loans.  However, based on reported annual revenues exceeding $1 billion in 2019, upon information and belief the corporate group must have exceeded the SBA's alternative size standard.

20

98.     Upon information and belief, the representative falsely and fraudulently answered "No" to the question: "Is the Applicant or any owner of the Applicant an owner of any other business, or have common management with, any other business?" and/or failed to provide a complete list of this required information.  Specifically, the representative falsely and fraudulently omitted to state that FBH's subsidiaries (*i.e.* the companies constituting the Fred Beans Automotive Group) were affiliated businesses that shared common ownership.

99.     The authorized representative further falsely certified "that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects" and acknowledged the federal criminal penalties attendant to "knowingly making a false statement to obtain a guaranteed loan from SBA."

100.     The authorized representative executed, dated, and submitted the Form 2483 to Huntington National Bank ("HNB") a federally insured financial institution and SBA participating lender based in Columbus, OH.

101.     On or about April 13, 2020, in reliance on FBH's materially false and fraudulent representations and certifications in its loan application, HNB issued a PPP loan (#4539397106) in the total amount of $744,100.00 to FBH (the "FBH Loan"). The SBA also paid HNB a lender fee of $22,323.00 for the loan.

102.     Upon information and belief, an authorized representative of FBH later prepared or caused to be prepared a PPP Loan Forgiveness Application Form, which contained a false and fraudulent certification that the borrower had complied with the SBA's PPP loan requirements and was therefore entitled to forgiveness of the FBH Loan.

21

103.   On or about August 30, 2021, the FBH Loan was forgiven in the total amount of $753,966.97, causing the United States to reimburse HNB for that amount (including interest), which (including the lender fee) cost the Government approximately $776,000.00.

**Despite being Ineligible under SBA Regulations, Fred Beans Parts, Inc. Applied for and Received a First-Draw PPP Loan, which was Later Entirely Forgiven**

104.   In or about early April 2020, FBP applied for a first-draw PPP loan in the amount of approximately $3 million.

105.   Upon information and belief, an authorized representative of FBP prepared SBA Form 2483, in which the representative falsely and fraudulently certified that FBP qualified as a small business concern eligible for participation in the PPP Loan Program, by failing to disclose its corporate group's total number of employees, and failing to acknowledge that FBP had numerous affiliates, by omitting information concerning those companies' common ownership.

106.   The representative indicated 319 as the "Number of Employees" for FBP.

107.   Upon information and belief, the representative falsely and fraudulently answered "No" to the question: "Is the Applicant or any owner of the Applicant an owner of any other business, or have common management with, any other business?" and/or failed to provide a complete list of this required information.  Specifically, the representative falsely and fraudulently omitted to state that FBP's affiliates (i.e. the companies constituting the Fred Beans Automotive Group) were affiliated businesses that shared common ownership.

108.   The authorized representative further falsely certified "that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects" and acknowledged the federal criminal penalties attendant to "knowingly making a false statement to obtain a guaranteed loan from SBA."

22

109.    The authorized representative executed, dated, and submitted the Form 2483 to HNB.

110.    On or about April 9, 2020, in reliance on FBP's materially false and fraudulent representations and certifications in its loan application, HNB issued a PPP loan (#9517477010) in the total amount of $3,071,320.00 to FBP (the "FBP Loan"). The SBA also paid HNB a lender fee of $30,713.20 for the loan.

111.    Upon information and belief, an authorized representative of FBP later prepared or caused to be prepared a PPP Loan Forgiveness Application Form, which contained a false and fraudulent certification that the borrower had complied with the SBA's PPP loan requirements and was therefore entitled to forgiveness of the FBP Loan.

112.    On or about September 14, 2021, the FBP Loan was forgiven in the total amount of $3,113,477.02, causing the United States to reimburse HNB for that amount (including interest), which (including the lender fee) cost the Government approximately $3.1 million.

## Despite being Ineligible under SBA Regulations, Auto Express Enterprises, Inc. Applied for and Received a First-Draw PPP Loan, which was Later Entirely Forgiven

113.    In or about April 2020, AEE applied for a first-draw PPP loan in the amount of approximately $80,000.00.

114.    Upon information and belief, an authorized representative of AEE prepared SBA Form 2483, in which the representative falsely and fraudulently certified that AEE qualified as a small business concern eligible for participation in the PPP Loan Program, by failing to disclose its corporate group's total number of employees, and failing to acknowledge that AEE had numerous affiliates, by omitting information concerning those companies' common ownership.

115.    The representative indicated 26 as the "Number of Employees" for AEE.

23

116. Upon information and belief, the representative falsely and fraudulently answered "No" to the question: "Is the Applicant or any owner of the Applicant an owner of any other business, or have common management with, any other business?" and/or failed to provide a complete list of this required information. Specifically, the representative falsely and fraudulently omitted to state that AEE's affiliates (i.e. the companies constituting the Fred Beans Automotive Group) were affiliated businesses that shared common ownership.

117. The authorized representative further falsely certified "that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects" and acknowledged the federal criminal penalties attendant to "knowingly making a false statement to obtain a guaranteed loan from SBA."

118. The authorized representative executed, dated, and submitted the Form 2483 to HNB.

119. On or about April 13, 2020, in reliance on AEE's materially false and fraudulent representations and certifications in its loan application, HNB issued a PPP loan (#4233877105) in the total amount of $80,600.00 to AEE (the "AEE Loan"). The SBA also paid HNB a lender fee of $4,030.00 for the loan.

120. Upon information and belief, an authorized representative of AEE later prepared or caused to be prepared a PPP Loan Forgiveness Application Form, which contained a false and fraudulent certification that the borrower had complied with the SBA's PPP loan requirements and was therefore entitled to forgiveness of the AEE Loan.

121. On or about August 16, 2021, the AEE Loan was forgiven in the total amount of $81,637.86, causing the United States to reimburse HNB for that amount (including interest), which (including the lender fee) cost the Government approximately $86,000.00.

24

SHN\902027.1

**Despite being Ineligible under SBA Regulations, Autorent of Doylestown, Inc. Applied for
and Received a First-Draw PPP Loan, which was Later Entirely Forgiven**

122.    In or about early April 2020, ADI applied for a first-draw PPP loan in the amount
of approximately $59,000.00.

123.    Upon information and belief, an authorized representative of ADI prepared SBA
Form 2483, in which the representative falsely and fraudulently certified that ADI qualified as a
small business concern eligible for participation in the PPP Loan Program, by failing to disclose
its corporate group's total number of employees, and failing to acknowledge that ADI had
numerous affiliates, by omitting information concerning those companies' common ownership.

124.    The representative indicated nine as the "Number of Employees" for ADI.

125.    Upon information and belief, the representative falsely and fraudulently answered
"No" to the question: "Is the Applicant or any owner of the Applicant an owner of any other
business, or have common management with, any other business?" and/or failed to provide a
complete list of this required information.  Specifically, the representative falsely and fraudulently
omitted to state that ADI's affiliates (i.e. the companies constituting the Fred Beans Automotive
Group) were affiliated businesses that shared common ownership.

126.    The authorized representative further falsely certified "that the information
provided in this application and the information provided in all supporting documents and forms
is true and accurate in all material respects" and acknowledged the federal criminal penalties
attendant to "knowingly making a false statement to obtain a guaranteed loan from SBA."

127.    The authorized representative executed, dated, and submitted the Form 2483 to
HNB.

25

128.    On or about April 9, 2020, in reliance on ADI's materially false and fraudulent representations and certifications in its loan application, HNB issued a PPP loan (#9582937002) in the total amount of $58,800.00 to ADI (the "ADI Loan"). The SBA also paid HNB a lender fee of $2,940.00 for the loan.

129.    Upon information and belief, an authorized representative of ADI later prepared or caused to be prepared a PPP Loan Forgiveness Application Form, which contained a false and fraudulent certification that the borrower had complied with the SBA's PPP loan requirements and was therefore entitled to forgiveness of the ADI Loan.

130.    On or about August 16, 2021, the ADI Loan was forgiven in the total amount of $59,557.15, causing the United States to reimburse HNB for that amount (including interest), which (including the lender fee) cost the Government approximately $62,000.00.

**Despite being Ineligible under SBA Regulations, McCafferty Autorent, Inc. Applied for and Received a First-Draw PPP Loan, which was Later Entirely Forgiven**

131.    In or about April 2020, MAI applied for a first-draw PPP loan in the amount of approximately $39,000.00.

132.    Upon information and belief, an authorized representative of MAI prepared SBA Form 2483, in which the representative falsely and fraudulently certified that MAI qualified as a small business concern eligible for participation in the PPP Loan Program, by failing to disclose its corporate group's total number of employees, and failing to acknowledge that MAI had numerous affiliates, by omitting information concerning those companies' common ownership.

133.    The representative indicated six as the "Number of Employees" for MAI.

134.    Upon information and belief, the representative falsely and fraudulently answered "No" to the question: "Is the Applicant or any owner of the Applicant an owner of any other

26

business, or have common management with, any other business?" and/or failed to provide a complete list of this required information. Specifically, the representative falsely and fraudulently omitted to state that MAI's affiliates (i.e. the companies constituting the Fred Beans Automotive Group) were affiliated businesses that shared common ownership.

135. The authorized representative further falsely certified "that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects" and acknowledged the federal criminal penalties attendant to "knowingly making a false statement to obtain a guaranteed loan from SBA."

136. The authorized representative executed, dated, and submitted the Form 2483 to HNB.

137. On or about April 13, 2020, in reliance on MAI's materially false and fraudulent representations and certifications in its loan application, HNB issued a PPP loan (#4620387100) in the total amount of $38,900.00 to MAI (the "MAI Loan"). The SBA also paid HNB a lender fee of $1,945.00 for the loan.

138. Upon information and belief, an authorized representative of MAI later prepared or caused to be prepared a PPP Loan Forgiveness Application Form, which contained a false and fraudulent certification that the borrower had complied with the SBA's PPP loan requirements and was therefore entitled to forgiveness of the MAI Loan.

139. On or about August 16, 2021, the MAI Loan was forgiven in the total amount of $39,400.90, causing the United States to reimburse HNB for that amount (including interest), which (including the lender fee) cost the Government approximately $41,000.00

27

SHN\902027.1

## THE GOVERNMENT HAS BEEN DAMAGED AS A RESULT OF DEFENDANTS' CONDUCT

140.    Upon information and belief, the Fred Beans Entities' Loans (including accrued interest) were forgiven in full. These reimbursements, plus lender fees, cost the Government approximately $4.1 million. Accordingly, Defendants' materially false statements have caused the Federal Government to be defrauded of taxpayer funds in the approximate amount of $4.1 million.

## CLAIMS FOR RELIEF

### COUNT I
### False Claims Act:
### Making or Using False Records or Statement to Cause Claims to be Paid
### 31 U.S.C. § 3729(a)(1)(B)

141.    Relator repeats, realleges, and incorporates paragraphs 1 through 140 of the Complaint as though fully set forth herein.

142.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have knowingly presented, and caused to be presented, false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

143.    As a result, thereof, the United States has been damaged in an amount equal to or greater than the amount paid by the United States for such false or fraudulent claims.

### COUNT II
### False Claims Act:
### Making or Using False
### Records or Statement to Cause Claims to be Paid
### 31 U.S.C. § 3729(a)(1)(B)

144.    Relator repeats, realleges, and incorporates paragraphs 1 through 140 of the Complaint as though fully set forth herein.

145.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have knowingly made, used, or caused to be made or used, false

28

SHN\902027.1

records or statements – *i.e.*, the false representations made or caused to be made by Defendants – material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

146.    As a result, thereof, the United States has been damaged in an amount equal to or greater than the amount paid by the United States for such false or fraudulent claims.

## DEMANDS FOR RELIEF

**WHEREFORE**, Relator, on behalf of the United States Government, demands judgment against Defendants, ordering:

A.    That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. § 3729, *et seq.*;

B.    That judgment be entered in Relator's favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than $14,308.00 and up to $28,619.00 for each such false or fraudulent claim, plus three times the amount of the damages sustained by the Government. 31 U.S.C. § 3729(a)(1)(G), 20 CFR Part 356 and 28 CFR Part 85 (*see* 89 FR 106310, Dec. 30, 2024), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C.    That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

D.    That judgment be granted for Relator against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit; and

29

E.      That Relator be granted such other and further relief as the Court deems just and proper.

## TRIAL BY JURY

Relator hereby demands a trial by jury as to all issues.

DATED:    April 3, 2025

SPIRO HARRISON & NELSON

By:_____

Eric H. Jaso
363 Bloomfield Avenue
Suite 2C
Montclair, NJ 07042
Telephone: (973) 310-4026
Facsimile: (973) 232-0887
ejaso@shnlegal.com

*Attorneys for Plaintiff-Relator*

CLERK
U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY

2025 APR -3  P 4: 00

30

SHN\902027.1